Filed 10/1/15  In re Ca.W. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Ca.W. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.W., <br><br> Defendant and Appellant. | F071090 <br><br> (Super. Ct. Nos. 14CEJ300040-1, 14CEJ300040-2, 14CEJ300040-3, 14CEJ300040-4) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and David F. Rodriguez, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

E.W. (father) is the father of Ca.W. (then age 6), R.W. (then age 5), Cr.W. (then age 2) and S.W. (then age 9 months) (together the children), who were taken into custody in February 2014.[1] Father appeals the juvenile court's orders and findings under Welfare and Institutions Code section 366.21, subdivision (e)[2] made at the six-month review hearing conducted in January and February 2015. Although the court continued reunification services, father contends he was aggrieved by the finding that the Fresno County Department of Social Services (Department) had offered him reasonable services. In particular, he argues Department failed to provide him sufficient mental health services and visitation with the children. We conclude substantial evidence supported the juvenile court's findings and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

**Detention**

On February 4, law enforcement and child protective services responded to a neighbor's complaint and found mother[4], father and the children living in an unsafe and unsanitary environment without food or baby formula. The trailer home contained cat feces and urine, trash, rotten food, broken toys, and soiled diapers. S.W. had severe untreated diaper rash, and several of the children had cat scratches on them. Mother was under the influence of methamphetamine. Father, who was recently hospitalized in a section 5250 protective hold due to a suicide attempt, did not think he could care for the children because of his depression. The children were detained.

---

[1]     All dates are to 2014 unless otherwise specified.

[2]     All further statutory references are to the Welfare and Institutions Code.

[3]     Because father specifically contends services were not reasonable in the areas of his mental health treatment and visitation, we emphasize those aspects in our recitation of the factual and procedural background.

[4]     Mother Brandi W. is not a party to this appeal.

2.

A follow-up visit with mother found her having a "'meth shake'" and covered in cut marks. Mother said she had not slept in four days due to methamphetamine use and that she had been "cutting" herself for the past 15 years. The bathroom in the home was found to be unusable. A "'roommate'" was found sleeping in the corner of the trailer.

On February 6, Department filed a section 300 petition alleging the children were at risk of harm due to mother's substance abuse problems and father's mental health issues.

At the detention hearing February 7, mother was present, father was not. The children were removed from mother and father's custody and reasonable supervised visitation ordered. Department was to provide mother and father random drug testing, substance abuse and mental health evaluations, and recommended treatment.

Following the detention hearing, father met with a department service coordinator and was provided with an Individualized Service Plan, which included a name and number to schedule visitation and parenting classes; a date and place for concurrent planning orientation and to register for drug testing; an appointment with a substance abuse specialist; and place and number to schedule an appointment for a mental health assessment. Specifically, father's service plan directed him to call Mental Health Assessment, Youth Link, with the telephone number attached, "as soon as possible." (Boldface & underlining omitted.) Father initialed and signed the form.

**Jurisdiction/Disposition**

The report prepared for jurisdiction on March 7, stated that father and mother attended the Concurrent Planning Orientation on February 28. At the jurisdiction hearing, mother was present, father was not, as he was admitted to the West Care inpatient treatment program that day. Mother and father had participated in visits with the children on February 10 and 14. Mother submitted on the report, and disposition was set for April 4.

3.

At the scheduled disposition April 4, father made his first appearance. The hearing was continued to May 2, as a combined jurisdiction/disposition hearing at the request of both father and Department.

On April 29, an amended section 300 petition was filed, adding the allegations that the children were at risk of harm because mother and father had exposed the children to domestic violence in the home.

The report prepared for the May 2 jurisdiction hearing stated the children reported incidents of father pushing mother off a chair, yelling at her, and telling her to leave the home, and the children were scared and crying. Both mother and father denied domestic violence in their relationship. The report also stated that father had said he used substances the night before the children were removed and he had used methamphetamine for 10 years, alcohol for 18 years, and cannabis for nine years. According to father, his last relapse was in January 2014. However, in an earlier March 28 interview with a social worker, father denied having a substance abuse problem, denied the need for substance abuse treatment, denied mental health problems, and denied ever attempting suicide. On April 17, father discharged himself from the West Care inpatient treatment program. The program reported that father had adjustment issues and inappropriate aggressive behavior toward staff and other clients. On the same day, father again denied having substance abuse, mental health or domestic violence problems. Instead, father characterized his needs as anger management, assistance with housing and obtaining employment.

The report stated mother had used methamphetamine for 21 years, cannabis for four years, and hallucinogens for two years. Mother reportedly said she was bipolar II with generalized anxiety disorder.

According to the report, both mother and father were attentive and affectionate during weekly supervised visitation and the children were visibly excited to see them.

4.

At the combined jurisdiction/disposition May 2, mother and father were present and submitted on the reports. The juvenile court found the allegations in the first amended petition true. It found mother's progress to date "moderate" and father's "minimal to moderate." The juvenile court ordered reunification services for both mother and father to include parenting classes, domestic violence evaluation and treatment, substance abuse evaluation and treatment, random drug testing, mental health evaluation and treatment, and supervised visitation a minimum of two times a week with discretion for Department to allow "unsupervised to liberal to extended" visits. Post-disposition mediation was planned for June 6 and a six-month status review set for October 31.

**Mediation**

The results of the June 6 mediation stated mother had had a mental health assessment in April 2014 but had not contacted anyone yet about starting treatment. She had completed her drug abuse assessment in February 2014 and completed residential treatment. She was testing clean. She had started parenting classes, but had not begun domestic violence classes.

As for father, he was referred for a mental health assessment February 11 and had an assessment scheduled April 14, but was a "no show." On April 22, the social worker advised father to schedule an appointment as soon as possible. When he did not, the social worker rescheduled the assessment, which was done July 17.[5]

Father completed his drug abuse assessment on March 6, entered residential drug treatment at West Care March 7, but self-discharged April 17. He entered King of Kings substance abuse treatment program April 23 and self-discharged May 5. Father entered Universal Health Network inpatient substance abuse program May 27 and was discharged May 30, due to inappropriate behavior. At the time of the mediation, father

---

**5**    There is a discrepancy in the record as to this date. The report states July 17; the social worker later testified it was June 17.

was testing clean; was on a wait list for parenting classes; and was scheduled to be assessed for domestic violence treatment on June 17.

**Six-Month Review**

The October 28 status review report stated father completed his mental health assessment with a therapist on July 17. According to the therapist, father minimized and denied domestic violence in his relationship with mother, although he acknowledged a history of angry outbursts and violent assaults, including one in 1997 which resulted in a head injury and self-described "partial amnesia." The therapist also reported that father disclosed he was addicted to sex and could not stop thinking about it. The therapist recommended a psychological evaluation and psychological risk assessment.

According to the status report, father was referred to Youth Link for a psychological evaluation and psychological risk assessment on August 7, but a letter could not be mailed to father to inform him of this as he was homeless at the time. Instead, the social worker spoke to father on August 8 and again on August 13, and on those dates advised father to schedule an appointment as soon as possible. Father did not do so and, as the result of subsequent changes in mental health providers, father was still in the process of being transferred to a new provider at the time of the October 28 status review report. During the August 8 conversation with the social worker, father stated he had, at some point, completed a Post Traumatic Stress Disorder (PTSD) psychological evaluation and "had to go" every six months. According to father, his PTSD was due to the trauma he had undergone when he was in a coma after being beaten and underwent rehabilitation in 1996. During father's drug abuse assessment March 6, father reported having been hospitalized in inpatient psychiatric care nine times between 1996 and 2014, twice for suicide attempts.

The report stated father again entered substance abuse residential treatment at West Care on August 18. On October 9 father told the social worker he was currently seeing a therapist at West Care and being treated for his PTSD. He also told the social

worker he had become angry with his substance abuse counselor and threw his phone against the wall, breaking it. On various occasions, father yelled and cursed at the social worker. Mother had also reported that father left her threatening voicemails saying he would kill her new boyfriend and that, if he could not have the children "'no one will.'"

The status report stated father did not attend his scheduled June 14 domestic violence assessment. He did attend a subsequent assessment on July 23, at which time he denied any domestic violence in his past or toward mother. Father was referred to a 52-week batterer's intervention program on September 23. He missed the first two sessions and was discharged from the program. Father's claim that he could not leave the West Care program for one of those sessions, as he was to undergo a tuberculosis test, was later confirmed as true.

Mother and father were attentive and affectionate with the children during supervised visits. But both struggled to actively discipline and redirect the children when needed. Therefore, father and mother were referred June 13 to receive therapeutically supervised visits (TSV's) but, due to being waitlisted, such visits were still in the process of scheduling as of October 16. Due to various statements made by father to the social worker, to mother, and on social media, there was concern that father might possibly "take the children" out of state. The social worker opined that visits could not progress until father completed a psychological risk evaluation.

The status report recommended that reunification services for mother and father continue. The six-month review scheduled for October 31 was rescheduled to November 12, at which time Department filed an addendum report now recommending that services to mother and father be terminated and a section 366.26 hearing be set. Included in the addendum report was information that father was to again begin batterer's treatment November 10 and to continue substance abuse treatment for another 30 days, as he had "been deviating from treatment." The report stated that, while the previous recommendation had been to continue services for mother and father "as there was not a

7.

permanent plan for the children," the current care provider was now willing to provide a permanent plan of adoption for all four children. The report stated that it was "unknown" whether father would benefit from the inpatient substance abuse treatment and batterer's treatment he was receiving because he had not participated in a psychological evaluation or psychological risk evaluation. Department "continue[d] to have serious concerns regarding [father]'s mental health and his ability to appropriately care for and provide a safe environment for the children."

Due to Department's change in recommendation whether to continue reunification services, the scheduled November 12 hearing was rescheduled for a contested hearing December 17. In the interim, another addendum report signed December 2 stated mother had relapsed, was terminated from her program, but entered another inpatient program and was doing well. Father continued to remain in residential substance abuse treatment where he continued to do well. His biggest "problem" was "not understanding or choosing to not understand why his children were removed." Father continued in batterer's treatment and was benefiting from the program. But father continued to upset mother during visitation with his negative comments, which kept both from paying full attention to the children.

At the December 9 settlement conference pending trial, the juvenile court vacated the December 17 trial date and reset it for January 28, 2015.

On December 13, Department filed a section 388 change order asking for a change in TSV's. As explained in the petition, father's negative feelings about his current marital/custody/living arrangements negatively affected the current visits, requiring the parents to have separate visits with the children. Not wishing to make the children's schedules even more difficult by adding an additional TSV (the children lived with the care provider in Coarsegold; mother and father were in Fresno), the recommendation was for one weekly TSV to be split, one hour each, for mother and father. The hearing on the petition was scheduled to coincide with the review hearing January 28, 2015.

8.

A combined six-month review and section 388 hearing was held over six days, January 28, 29, and 30, and February 3, 10, and 11, 2015. The social worker testified she was assigned the case on March 24, 2014. She testified father was currently attending the 52-week batterer's treatment, was in outpatient treatment, and lived in a sober living facility. According to the social worker, the children continued to do well in placement and the current care providers were willing to adopt all four children.

On cross-examination by father's counsel, the social worker testified her initial recommendation on October 28 to continue reunification services was a "guarded recommendation," which she thought was in the best interests of the children as there was no permanent plan identified for them at that point. The social worker acknowledged that, at the time of her initial recommendation, father was in inpatient treatment and doing well, he had completed parenting classes, and it appeared that he would be able to complete the goals set for him within the time period allowed. The primary reason for changing the recommendation on services was that a permanent plan had now been identified for the children.

When asked about father's mental health services, the social worker stated father had participated in a mental health assessment June 17, in which father disclosed a previous head injury and trauma, as well as his addiction to sex. The social worker spoke to the therapist and, after receiving the actual assessment, made a psychiatric evaluation referral August 4. On August 8, the social worker told father to call Youth Link and schedule the evaluation. The social worker spoke to father again on August 13 and again told him to make the call. When father did not, the social worker called Youth Link on or about September 15 and was told Youth Link no longer scheduled psychiatric evaluations and father would have to wait for another provider. According to the social worker, had father called when asked to do so, Youth Link would have kept the referral and he could have had the evaluation done through them. Because he did not, the referral was sent back and the social worker had to wait until it was assigned to a new provider. The social

worker made another referral October 13, to make sure it was not "lost." The social worker acknowledged that the psychiatric evaluation was one consideration in assessing father's ability to participate in residential treatment for his drug abuse.

The social worker testified that she contacted someone at Central Star on December 2 and was told a psychiatric evaluation for father had not been coordinated because "they still did not have the testing tools needed to do the psych eval." As of February 10, 2015, there still was no psychiatric evaluation scheduled for father. But, according to the social worker, father was seeing a therapist at West Care and being treated for PTSD.

A clinical psychologist who supervised the TSV's with mother, father and the children in October and November testified that one of the goals during visitation was to reduce the negative interaction between mother and father. According to the psychologist, this goal was attainable by having separate visits for mother and father. The psychologist testified that father, at times, failed to properly address the children's non-compliant behavior by ignoring it. But he also, at times, implemented the suggestions made by the psychologist.

The social worker testified that Department was requesting one weekly TSV be temporarily removed in order to stabilize the children's behaviors. Keeping the two scheduled TSV's made the children's weekly scheduled services too hectic. The psychologist was also recommending that the one remaining TSV be separated into two separate hours – one for mother, one for father.

At the conclusion of the hearing February 11, 2015, father's counsel argued that Department failed to provide reasonable services, particularly with respect to father's mental health issues and visitation. Counsel argued father had attempted to coordinate his mental health assessment, but was unable to get an assessment set up. According to counsel, this assessment was one of the reasons visitation had not progressed beyond supervised. Counsel objected to Department's request to reduce the TSV's because they

10.

were needed.  Counsel argued visits could take place on the weekends or closer to where the children lived if transportation was arranged for father.

The juvenile court, in its ruling, found reasonable reunification services had been provided,

> "[n]ot perhaps as efficiently as perhaps could have been done, but provided nevertheless.  I don't think it's fair to look solely at the Department when examining this issue.  The parents have some responsibility.  And, in regards to father, certainly he has an obligation to follow the directives of the social worker and get the psych eval and risk assessment done.  He did not do that.  And there was a change of providers.  And from thereon after resulted in a delay, which is very troubling to the Court."

The juvenile court went on to state the biggest barrier to reunification faced by father was his mental health issues and

> "father's argument in regards to mental health issues is compelling.  Yes, he dropped the ball.  He didn't get his evaluation done, but still it was known and out there.  And now we are seven months later, and we are still at square one. So at some point, I would think perhaps the Department would say, yeah, dad screwed up.  He didn't get it done.  Now he has a different provider, but we have to get it going.  And some fires should have been lighted.  So I think the responsibility is on both sides.  And I don't think there's enough to say that reasonable services have not been provided. I'm not going to make that finding."

The juvenile court, however, found it had "seen enough to say that reunification services should continue," and there was substantial probability that the children would be safely returned home "if things are done … swiftly, efficiently and thoughtfully." Reunification services were continued to the 12-month hearing, in hopes father "gets his psych evals done and gets some direction.  And that the visits continue with the children and are productive, and the lessons that are being taught are learned by the parents and then passed down to the kids."

As for Department's section 388 petition, the juvenile court granted it in part and denied it in part.  The TSV's were reduced to once a week for a total of two to two and one-half hours, to be split between mother and father or combined when deemed

11.

therapeutically advisable. Mother and father were also ordered to have supervised split visits for two hours a week with the two oldest children in the vicinity of the care provider; visits with the two younger children who were not on a school schedule would be more frequent and in Fresno.

**DISCUSSION**

## 1. Appellate Jurisdiction

Initially, we address whether we have jurisdiction over father's appeal from the six-month review hearing orders. Section 395, subdivision (a)(1) provides, in relevant part, "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." In a section 300 proceeding, the order entered at the dispositional hearing is considered to be a final judgment, and subsequent orders are considered to be appealable as postjudgment orders. (*In re T.G.* (2010) 188 Cal.App.4th 687, 692.)

To have standing to appeal from a postjudgment order in a juvenile dependency proceeding, a parent must be aggrieved by the order. (*In re T.G.*, *supra*, 188 Cal.App.4th at p. 692.) "'For purposes of appellate standing in dependency cases, a parent is aggrieved by a juvenile court order that injuriously affects the parent-child relationship.'" (*Ibid.*)

In *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147 (*Melinda K.*), the court held the juvenile court's finding made at the six-month review hearing that reasonable services had been provided to the mother was not appealable. The court reasoned the mother was not aggrieved by that finding at the time it was made because the juvenile court had continued reunification services, had found the mother was in

12.

compliance with her case plan, and had taken no adverse action against her.[6] (*Melinda K.*, *supra*, at pp. 1153-1154.)

In contrast, in *In re T.G.*, *supra*, 188 Cal.App.4th at page 696, the court held a reasonable services finding made as part of a six-month review hearing order was adverse to a parent's interest in reunification and therefore was directly appealable. Although the juvenile court had continued reunification services, the appellate court concluded the father was aggrieved by the reasonable services finding because the juvenile court also found the father was not in compliance with his case plan, the father's progress in mitigating or alleviating the causes necessitating placement was inadequate, and it was not reasonably probable the child would be returned to the father's custody. (*Id.* at p. 693.)

Here, father contends failure to reverse the finding that reasonable services were offered him would continue to prejudice him at the 12-month review and dilute the arguments he would likely make if services were not continued at that point. Department argues father's case is not analogous to *In re T.G.* and more like *Melinda K.*, in that the juvenile court did not find father had not made substantial progress in his case plan and did find there was a "substantial probability" that the children may be safely returned to father.

We find this case falling somewhere between *In re T.G.* and *Melinda K.* At the six-month review hearing, the juvenile court continued reunification services, finding enough compliance on mother's and father's part to warrant doing so. It also found there was a substantial probability that the children may be returned to mother and father, but only "if things are done, and if they are done swiftly, efficiently and thoughtfully." The juvenile court expressed concern that father's mental health issues were the basis of much

---

[6] The appellate court did, however, exercise its discretion to treat the appeal as a petition for writ of mandate and address the issue on its merits. (*Melinda K.*, *supra*, 116 Cal.App.4th at pp. 1153-1154.)

13.

of his problems and Department had acknowledged that substance abuse and visitation would not progress without addressing father's mental health issues. Furthermore, the 12-month review hearing was scheduled for April 3, 2015, just two months after the six-month review findings were made. For these reasons, we find father was sufficiently aggrieved by the six-month review hearing orders to have standing to appeal, even though the juvenile court made the favorable order continuing reunification services.

## 2. Standard of Review

Except under circumstances not applicable here, reasonable reunification services must be offered when a child is removed. (§ 361.5; *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case. (*Earl L. v. Superior Court*, *supra*, at p. 1501.) "'[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult ….' [Citation.]" (*Ibid.*)

We review the juvenile court's finding that reasonable services were provided or offered under the substantial evidence standard. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010.) "[I]n reviewing the reasonableness of the reunification services provided by the Department, we must … recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) In reviewing the reasonableness of services offered, we view the evidence in a light most favorable to the respondent and draw all reasonable inferences to

14.

uphold the juvenile court's order.  (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.)

**Substantial Evidence Supported the Finding of Reasonable Services**

### A.  *Mental Health Services*

Father argues, despite Department's assertion that the removal of the children from his custody was necessary due to concerns about father's mental health, "the Department did not schedule a psychological evaluation or psychological risk assessment of father between February 4, 2014 (when the children were detained) and February 11, 2015 (when the six-month review hearing was concluded), or provide him mental health services, such as coordinating psychiatric or psychological treatment."

Viewing the evidence in a light most favorable to the respondent and drawing all inferences to uphold the juvenile court's order (*In re Mary B.*, *supra*, 218 Cal.App.4th at p. 1483), we conclude the record shows Department made reasonable efforts to overcome the obstacles father placed on scheduling mental health services.

Following the detention hearing February 7, father met with a department service coordinator and was provided with an Individualized Service Plan, which specifically advised father to call Youth Link and schedule a mental health assessment.  The telephone number was provided and the request was that he do so "as soon as possible." (Boldface & underlining omitted.)  He was scheduled for a mental health assessment April 14, but was a "no show."  On April 22, the social worker advised father to reschedule an assessment appointment as soon as possible.  When father did not follow through, the social worker rescheduled the assessment, which took place June 17. Thereafter, the social worker spoke to the therapist who administered the assessment. The therapist recommended father participate in a psychological evaluation and psychological risk assessment.  The social worker made the psychological evaluation referral August 4, after receiving the actual assessment and recommendation form from the therapist.  On August 8, the social worker told father to call Youth Link and schedule

15.

the evaluation. The social worker spoke to father again on August 13 and again told him to schedule the evaluation. When father failed to do so, the social worker called Youth Link on or about September 15 and was told Youth Link no longer scheduled psychological evaluations "due to the changes in service providers."

According to the social worker, had father called when asked to do so, Youth Link would have kept the referral and he could have had the evaluation done through them. Because he did not, the referral was sent back and the social worker had to wait until it was assigned to a new provider. The social worker made another referral October 13, to make sure it was not "lost."

Father contends there was an unreasonable delay in referring him to a psychological evaluation or psychological risk assessment. We disagree. While the lack of a referral in later months is disconcerting, father's failure to progress and benefit from mental health services was due, in large part, to his failure to participate early on in the reunification process. He was provided with multiple chances to make the necessary appointment to begin mental health services and did not do so.

Reunification services are not inadequate simply because the parent is unwilling. There is a distinction between "reunification services" provided by the department and "reunification efforts" made by the parent. An unwilling parent cannot be forced to participate in reunification services. (*In re Laura F.* (1983) 33 Cal.3d 826, 839; *In re Joanna Y.* (1992) 8 Cal.App.4th 433, 442; *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220; *In re Raymond H.* (1985) 175 Cal.App.3d 556, 563; *In re Lynna B.* (1979) 92 Cal.App.3d 682, 702.) Father's "real problem was not a lack of services … but a lack of initiative to consistently take advantage of the services that were offered." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) Department was not required to take father "by the hand or lead him step-by-step along the way." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1166-1167.)

## B. *Visitation*

Father also argues there was no substantial evidence Department provided him reasonable services with respect to visitation. Specifically, father contends visitation "was never modified to allow visitation in his residential treatment program or sober living program, or more lengthy visitation on weekends when it would not conflict or interfere with the children's schooling." According to father, the failure to provide reasonable visitation was the byproduct of Department's failure to provide him reasonable services to assess and provide services to treat his mental health.

Father relies, in part, on *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*), a case involving developmentally disabled parents whose reunification services were terminated at the 18-month review hearing. (*Id.* at pp. 1419-1423.) In *Tracy J.*, the appellate court concluded the agency did not provide services designed to address the mother's physical disabilities, it unnecessarily limited visitation, did not inform the parents of their child's medical appointments in advance, and did not instruct them on how to treat their infant child's asthma. (*Id.* at pp. 1426-1427.) Despite fully complying with their service plan and their demonstration of ability to care for their child, they were never given more visitation because the department was concerned about the parents' developmental disabilities. (*Id.* at pp. 1419-1420, 1426-1428.) The appellate court held that reasonable services were not provided because the parents had been allowed only restricted visitation rights:

> "We emphasize that harm to a child cannot be presumed from the mere fact a parent is developmentally disabled. The Agency may not limit a developmentally disabled parent's visitation in the absence of evidence showing the parent's behavior has jeopardized or will jeopardize the child's safety, and it cannot impede the progression of visitation services to a parent solely out of concerns about the parent's mental health status." (*Id.* at p. 1419.)

The gist of father's argument here is that Department did not provide him reasonable visitation tailored to his particular requirements, particularly mental health services.

Our review of the record, however, demonstrates father received reasonable services in the area of visitation. It is true that father's visits did not progress, in part, because he had not yet participated in a psychological evaluation and risk assessment and made progress in those services. However, unlike the parents in *Tracy J.*, father was partially to blame for his lack of mental health treatment, as previously discussed. In addition, it was father's behavior, his refusal to stick with a substance abuse program, his inappropriate statements in front of mother and the children, and lack of progress during visits with the children from the very beginning which resulted in the continued need for supervised visits. That father suffers from emotional problems does not excuse him from the statutory requirement to participate in a reunification plan, as some capacity to achieve reunification goals is presumed. (*Angela S. v. Superior Court*, *supra*, 36 Cal.App.4th at p. 762.)

Viewing the evidence in a light most favorable to the respondent and drawing all inferences to uphold the juvenile court's order (*In re Mary B.*, *supra*, 218 Cal.App.4th at p. 1483), we conclude the record shows Department made reasonable efforts to provide father with reasonable visitation beginning at the time of detention in February. At the very first visit on February 10, father insisted on talking to the social worker about the case and was asked not to do so during the visit in front of the children. By the time of jurisdiction/disposition in May, mother and father interacted appropriately with the children and Department was given discretion to provide "unsupervised up to liberal visits." (Boldface & underlining omitted.) However, thereafter, due to concerns about mother and father during supervised visits, TSV's were recommended.

TSV's began at the end of October. Father did not attend the first visit on October 27; he was 20 minutes late to the November 10 visit; 15 minutes late to the December 26 visit. One of the goals at the TSV's was that father refrain from making "negative, disparaging comments" toward mother and that he refrain "from any non-verbal behaviors that intimidates or make[s mother] uncomfortable." As of December 3,

18.

father's behaviors had not improved, degrading the quality of time he spent with the children. Father's negativity affected the children's behavior. The visitation therapist who conducted the TSV's opined that strengthening the family bonds "will likely be quite limited (or even result in a regression) if [father's] highly problematic behavior towards [mother] continues." As of December 29, father was making moderate progress in reducing the number of negative comments he made towards mother. He continued to become overly involved with the older two children and often did not interact with the younger two.

The visitation therapist did not foresee any likelihood, much less substantial probability, that father would progress beyond supervised visits for a significant period. And, despite father's parenting education, visitation with the children had not gone well because father was unable "to exercise appropriate parenting to avoid necessary intervention by the supervisor and to use the tools [he was] instructed to improve [his] hands-on appropriate parenting skills." Father refused to admit domestic violence as being an issue in the home. The children showed no "significant bond" with father and exhibited consistently disruptive behavior in visits, especially when father was present. Also at visits, father "has made concerning statements that bring up concerns regarding the children's safety."

Given the circumstances of the case and the evidence before the juvenile court, both in testimony and in reports in evidence, the reasons for lack of progress in visitation are well documented and provide substantial evidence to support the juvenile court's finding as to reasonable services regarding visitation.

## DISPOSITION

The orders and findings made at the six-month review hearing are affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.